IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MAUREEN A. SANDERS, as Guardian Ad Litem for
JOSEPH MASCARENAS, DESTINY MONDRAGON,
MORANDA MONDRAGON, JEFFREY
MONDRAGON, JR.; and PAUL RUIZ, Individually,

        Plaintiffs,

      vs.                           No. 06cv986 MCA/RHS

THE NEW MEXICO CHILDREN YOUTH
& FAMILIES DEPARTMENT, FRANCINE
CRESPIN, Individually and as a State Actor,
PATRICK J. MARTINEZ, Individually and
as a State Actor, CHRISTINE M. ARCHULETA,
Individually and as a State Actor,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' *Motion for Summary Judgment* [Doc. 92], filed August 18, 2008. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion as to Count IV (deprivation of due process in violation of the Fourteenth Amendment, 42 U.S.C. §1983) and declines to exercise supplemental jurisdiction over the state-law claims asserted in Count I (negligence of Defendant Children Youth & Families Department); Count II (negligence of Defendant Francine Crespin); and Count III (breach of contract/third-party beneficiary claim).

## I. BACKGROUND

This case arises from a violent and unquestionably traumatic incident that occurred at a foster home in Las Vegas, New Mexico, where five siblings had been sent by Defendant Children Youth & Families Department ("CYFD") for respite[1] care.

On October 16, 2003, Gloria Wiggins requested respite care for the weekend of October 18-19, 2003. Ms. Wiggins was serving as a foster parent to Paul Ruiz, Joseph Mascarenas, Destiny Mondragon, Moranda Mondragon, and Jeffrey Mondragon, Jr. ("the children") after the children had been removed from their biological parents' home and taken into the custody of CYFD on an emergency hold on October 10, 2003. Ms. Wiggins spoke to a CYFD employee, who then spoke to Defendant Patrick Martinez.[2]

At all relevant times, Mr. Martinez was a CYFD placement worker and had been involved in the background investigation and licensing procedure that resulted in the approval of the home of Francine Crespin for respite or emergency foster care. Mr. Martinez contacted another CYFD employee (and foster parent herself), Yolanda Yeaman. Ms. Yeaman is Ms. Crespin's mother. Ms. Yeaman suggested Ms. Crespin's home for the respite placement of the children. [See Doc. 92; Exh. C; depo. of Patrick Martinez at 115-116].

---

[1] "Respite" is a temporary visit with another foster family for a short period while the original foster family is unable to provide care. [See Doc. 99; Exh. 2, N.M. ADMIN CODE 8.27.3.16(E)]

[2] On April 5, 2007, Patrick Martinez legally changed his name to Patrick McDermott. [See Doc. 92; Exh. F, McDermott affidavit]. However, he is referred to as "Patrick Martinez" throughout this *Opinion*.

Accordingly, on Saturday, October 18, 2003, the children were taken to Ms. Crespin's home for a stay that was intended to last until the following day.

Ms. Crespin had applied to become a foster parent on June 11, 2003, and was approved on October 3, 2003. [See Doc. 92; Exh. F, Martinez aff. at 2, 4; see also Doc. 99; Exh. 14 at 5 , "Foster/Adoption Application"].  During a July 24, 2003 interview with Mr. Martinez at her home, Ms. Crespin informed Mr. Martinez that she was involved in a serious relationship with a man named David Gonzales, and that she hoped that the relationship would eventually lead to marriage.  According to both Mr. Martinez and his supervisor, Defendant Christine Archuleta, Ms. Crespin did not mention Mr. Gonzales prior to the July 24 interview, and it was only after CYFD conducted a background check that Mr. Martinez and Ms. Archuleta learned of Mr. Gonzales. [See Doc. 99; Exh. 1, depo. of Christine Archuleta at 41; Doc. 92; Exh. F, Martinez. aff. at 2].

The background check included a review of police records, which revealed that (1) on December 4, 2001, "Mr. David A. Gonzales [had] attempted to commit suicide by shooting himself with a high[-]powered rifle in the face[,]" [see Doc. 99; Exh. 9, 12/4/01 "State of New Mexico Uniform Incident Report" at 2]; and (2) on April 17, 2003, Mr. Gonzales was arrested for (a) battery against a household member; (b) false imprisonment; and (c) aggravated assault against a household member, the complainant being Ms. Crespin. [see id.; Exh. 10, 4/17/03 "State of New Mexico Uniform Incident Report" at 1-2].

The police report memorializing the December 4 incident states that Mr. Gonzales had been drinking heavily when he called his former wife, "saying he would kill himself if she

did not get back together with him." [Doc. 99; Exh. 9, 12/4/01 report at 3]. The report also states that the investigating officer spoke to Ms. Crespin, who informed him that she had gone to Mr. Gonzales' house the prior evening, in response to a telephone call during which Mr. Gonzales "sounded drunk and depressed." According to the police report, when Ms. Crespin arrived, "she stopped [Mr. Gonzales] from hanging himself from a rope in the back of the house." [Id.; Exh. 9, 12/4/01 report at 4]. As a result of the attempted suicide by rifle on December 4, 2001, Mr. Gonzales underwent "multiple" surgeries, and was left disfigured, with the left side of his face "caved in" and one eye missing. [Id.; Exh. 5, depo. of Francine Crespin at 61].

The police report memorializing the April 17 incident reveals that Mr. Gonzales and Ms. Crespin were arguing at her home when "[he] followed her into the bedroom and grabbed both her arms and threw her on the bed." [Doc. 99; Exh. 10, 4/17/03 report at 2]. During the April 17 incident, Mr. Gonzales also (1) hit a plate of food with such force that food splattered up onto the walls; (2) stepped on Ms. Crespin's eyeglasses; (3) kicked a door shut; and (4) threw a brick at Ms. Crespin's car as she was driving away, shattering a headlight. [See id.; Exh. 10, 4/17/03 report at 2; Doc. 92; Exh. K, attached Crespin statement at 2].

During the July 24 interview, Mr. Martinez and Ms. Crespin discussed the police reports "in depth." [Doc. 99; Exh. 12, "Chronological of Events"]. Mr. Martinez determined that Mr. Gonzales was "an active presence in the home, even though he [was] not currently dwelling there." [Doc. 99; Exh. 11, "Running Narrative" at 1]. In fact, it is not clear whether

Ms. Crespin and Mr. Gonzales ever lived together. [Compare id.; Exh. 5, Crespin depo. at

22, 107-108 (explaining that Ms. Crespin and Mr. Gonzales lived together around the time

of the April 2003 domestic-violence incident, but that he moved out right after that) and Doc.

92; Exh. F, Martinez aff. at 2 ("[Ms.] Crespin informed me that [Mr.] Gonzales did not live

at her home and never had.").  In any event, Mr. Martinez made a note to "[d]iscuss with

Supervisor, Christine Archuleta, before returning for conclusion of the Home Study." [Id.,

Exh. 12 at 1].

        Through her deposition, Ms. Archuleta testified that she became aware of the

December 4 and April 17 incidents during an individual staffing with  Mr. Martinez. [Doc.

99; Exh. 1, depo. of Christine Archuleta at 39].  She also explained that Mr. Martinez

expressed concern that the incidents involved Ms. Crespin's then-boyfriend, and "that he was

a part of her life and [Mr. Martinez and Ms. Archuleta] needed to look into the situation."

[Id.; Exh. 1, Archuleta depo. at 41].  According to Ms. Archuleta, she and Mr. Martinez then

reviewed the police reports relating to the two incidents in some detail. [See id.; Exh. 1,

Archuleta depo. at 42-43].  Still, Ms. Archuleta was concerned over the "uncertainty of [Mr.

Gonzales' background [and] not knowing who he [was]."  [Id.; Exh. 1, Archuleta depo. at

47]. Therefore, she "directed [Mr. Martinez] to inform Ms. Crespin that [Mr. Gonzales] must

submit to police background checks as part of the Foster Parent licensing procedure. . . ."

[Id.; Exh. 13, "Chronological of Events" at 1].

        Mr. Martinez' notes reflect that he "was instructed to include [Mr. Gonzales] in the

certification process; background checks, fingerprints, individual interview, etc." [Doc. 99;

Exh. 11 at 1]. To be sure, the New Mexico Administrative Code provides, in pertinent part, that

> [c]riminal records checks of all applicants and all other adults in the home will be required and will include a national criminal records check (FBI Check) a state wide check through the New Mexico state police and local police check. Any police records discovered in the police records check shall be reviewed for information affecting an applicant's qualifications. Persons who have constructively resolved previous problems may be licensed, except that no person who has a record as described in 13.3 [now Subsection C of 8.27.3.13 NMAC] shall be licensed. Any reasonable doubt that prior misconduct has been resolved shall be interpreted in favor of the safety of foster children, and the application denied.

[Id.; Exh. 2, N.M. ADMIN. CODE 8.27.3.15(B)(2)].

Ms. Archuleta also ordered Mr. Martinez to ascertain the amount of time that Mr. Gonzales, as well as others, would be spending in Ms. Crespin's home. [Doc. 99; Exh. 1, Archuleta depo. at 85]. Ms. Archuleta additionally gave the directive that foster children were not to be left in the care of anybody other than the licensed foster parent. However, she described this directive as "standard practice" inasmuch as she would give the same order in "any other case[,]" and did not specifically single out Mr. Gonzales. [Id.; Exh. 1, Archuleta depo. at 87-88].

On July 31, 2003, during his weekly contact with Ms. Crespin, Mr. Martinez informed her that Mr. Gonzales would need to be included in the certification process. [Doc. 99; Exh. 11 at 1]. Although Mr. Gonzales initially agreed to participate, he later changed his mind. Mr. Martinez' notes state:

> 08-12-03 Weekly Contact.  Francine called to say that her
> boyfriend had changed his mind; since he did not live in the
> home, he decided he did not have to comply with our request for
> background information.  Told Francine I would staff with
> Supervisor.
> . . .
> 08-13-03 Weekly Contact.  Staffed with Supervisor yesterday,
> and discussed with Francine today.  Boyfriend[']s refusal will be
> noted in final homestudy report.   A safety plan will be
> developed with Francine, and amount of actual time in home by
> boyfriend will be ascertained.  Also, there will be no permission
> to leave the children in his care at any time.

[Id.; Exh. 11 at 2].  Through her deposition, Ms. Archuleta confirmed the necessity of

including Mr. Gonzales in the home study and licensing process, since "he was a significant

part of [Ms. Crespin's] life and was her boyfriend." [Id.; Exh. 1, Archuleta depo. at 112].

However, Ms. Crespin testified that when Mr. Gonzales refused to take part in the

certification process, she ended their relationship. [See Doc. 99; Exh. 5, Crespin depo. at 42

(explaining that Mr. Gonzales ceased to be an active presence in her life "[w]hen CYFD

asked for an interview . . . and he said no[.] I mentioned to him that this is something that I

wanted to do for myself and that we would have to end our relationship."  Mr. Martinez'

notes of September 5, 2003 indicate that Mr. Gonzales was "no longer in picture. . . ." [Id.;

Exh. 11 at 2].  Through her deposition, Ms. Archuleta testified that because Ms. Crespin

represented that her relationship with Mr. Gonzales was over, Ms. Archuleta recommended

licensure, whereas if the relationship had not ended, Ms. Archuleta would have wanted

additional investigation, further findings, and more information gathered before a decision

on licensing was made. [Id.; Exh. 1, Archuleta depo. at 52].  The home study that was signed

by both Mr. Martinez and Ms. Archuleta states, among other things, that Ms. Crespin's separation from Mr. Gonzales was "viewed as a highly positive personal choice . . . , since it indicate[d] a willingness to separate herself from a high risk, apparently dysfunctional relationship for the express purpose of complying with [the foster-care program's] licensing requirements." [Id.; Exh. 13 at 3].

On the other hand, the study also notes Ms. Crespin's tendency to minimize Mr. Martinez' concerns about her relationship with Mr. Gonzales, and states that Ms. Crespin's

> weaknesses [were] apparent in the fact that it took something as invasive as the licensure process to establish that life[–]changing choices were in order. She spoke highly of the relationship with [Mr. Gonzales] throughout the interview, and was resistant to suggestions that joint couples therapy might be beneficial for them. His suicidality and the domestic violence pattern would indicate against licensure, if he remained in the family picture without submitting to a background check. His removal from the picture, largely as a result of the licensure requirements, means that Francine came to understand that the tenets of the program are meant to safeguard and protect all children—including her own. This demonstrates her ability to learn from new insights, and means that she is a strong candidate for licensure approval.

[Id.; Exh. 13 at 4, 5].

On September 17, 2003, Mr. Martinez signed the home study recommending that Ms. Crespin's home be approved for initial licensure as a respite or emergency-care home. Ms. Archuleta signed and noted her approval on October 3, 2003. [See Doc. 92; Exh. G, "Foster Care Home Study" at 6]. That same day, Ms. Archuleta mailed Ms. Crespin her foster-parent license. [Id.; Exh. N, Oct. 3, 2003 letter from Christine Archuleta to Francine Crespin].

On October 18, 2003, the children were at Ms. Crespin's house when Mr. Gonzales arrived at the home unannounced, and informed her "[t]hat he needed some items of his that [she] had at [her] house."[3] [Doc. 99; Exh. 5, Crespin depo. at 72]. After telling Mr. Gonzales that "he couldn't be [t]here [because she] had kids in the home [and h]e wasn't allowed to be at [her] home[,]" Ms. Crespin took the requested items and placed them on the sidewalk. [Id.; Exh. 5, Crespin depo. at 71-73]. Mr. Gonzales then told Ms. Crespin that he had something for her, and pulled out a rifle. [Id.; Exh. 5, Crespin depo. at 74]. Ms. Crespin made her way back into the house, where she locked the door but not the security lock. She told the children that there was a man with a rifle outside and that they needed to get out of the house. [Id.; Exh. 5, Crespin depo. at 74].

Brothers Paul Ruiz and Joseph Mascarenas took their little sister, Moranda Mondragon, out of the house and to Ms. Crespin's neighbor's home, but not before Mr. Gonzales broke a pane of glass in the door, came into the house, and began chasing Ms. Crespin and hitting her with the rifle. [See Doc. 99; Exh. 17, depo. of Jeffrey Mondragon, Jr. at 14-15; Exh. 18, depo. of Joseph Mascarenas at 22-23; Exh. 20, depo. of Moranda Mondragon at 21]. Destiny and Jeffrey Mondragon ran into another room in Ms. Crespin's house, where Destiny called 911 with a cell phone she had removed from Mr. Gonzales' pocket after hitting him. However, Destiny eventually "threw the phone down because [the

---

[3] Ms. Crespin testified that these items were "a first aid kit and possibly . . . [a] fire extinguisher" that she had borrowed to pass her certification with CYFD. She explained that she had borrowed these items from Mr. Gonzales because she could not afford at the time to buy them. [See Doc. 99; Exh. 5, Crespin depo. at 72].

911 operator] wasn't listening to [her]" and she and Jeffrey ran out of the room and through the front door of the house. [Id.; Exh. 7, depo. of Destiny Mondragon at 29-30].[4]  According to Destiny, Ms. Crespin then came out of the house, having been "hurt really bad."  [Id.; Exh. 7, depo. of Destiny Mondragon at 32].

All of the siblings (with the exception of Moranda, who remained with the neighbors) and Ms. Crespin then took cover behind a line of parked cars in the street outside Ms. Crespin's house. [Doc. 99; Exh. 7; depo. of Destiny Mondragon at 35].  Once they were outside, the children heard and saw Mr. Gonzales firing shots from inside the house. [Id.; Exh. 18, depo. of Joseph Mascarenas at 28-31; Exh. 17, depo. of Jeffrey Mondragon, Jr. at 23; Exh. 7, depo. of Destiny Mondragon at 34].  Police arrived and both Mr. Gonzales and the police officers were now shooting.  The police also threw tear gas into Ms. Crespin's house. [Id.; Exh. 17, depo. of Jeffrey Mondragon, Jr. at 23; Exh. 18; depo. of Joseph Mascarenas at 28-29].  Eventually the children and Ms. Crespin made their way to the home of Ms. Crespin's neighbors, before being taken to the hospital. [Id.; Exh. 20, depo. of Moranda Mondragon at 28-29; Exh. 21, depo. of Paul Ruiz at 19-20].  The children, who were scared but apparently not physically injured, were returned to their biological parents that night. [Id.; Exh. 21, depo. of Paul Ruiz at 20-21; Exh. 20, depo. of Moranda Mondragon at 29; Exh. 17, depo. of Jeffrey Mondragon, Jr. at 25].  Mr. Gonzales killed himself in Ms.

---

[4]  Jeffrey, however, testified that he and Destiny escaped from the house by climbing out a window. [See Doc. 99; Exh. 17, depo. of Jeffrey Mondragon, Jr. at 22].  While the manner of their escape is not material here, the Court notes that, given their experience, it is not at all surprising that the children would have conflicting memories.

Crespin's house. [See Doc. 92 at 2].

On October 12, 2006, the children filed their *Complaint for Damages and Civil Rights and Violations* against CYFD, Ms. Crespin,[5] Mr. Martinez, and Ms. Archuleta, alleging that (1) CYFD negligently failed to operate and maintain Ms. Crespin's foster home in a manner consistent with policy and procedure (Count I); (2) Ms. Crespin breached her duty of ordinary care to protect the children from harm and injury (Count II); (3) CYFD breached a contract for services for which the children were intended third-party beneficiaries (Count III); and (4) the individually named defendants deprived the children of their Fourteenth Amendment right to due process by, among other things, creating a danger of harm to the children as a result of certifying a home they knew to have been a recent site of violence and abuse, and failing to exercise professional judgment in certifying the home and placing the children there. [See Doc. 1 at 6-8]. CYFD, Mr. Martinez, and Ms. Archuleta have moved for summary judgment. [See generally Doc. 92].

## II. ANALYSIS

### 1. Summary Judgment

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When a

---

[5] By Order entered April 23, 2008, Ms. Crespin was dismissed with prejudice from this lawsuit. [See Doc. 69].

motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed.R.Civ.P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."  Id.  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324. It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### 2. 42 U.S.C. § 1983 and the Defense of Qualified Immunity

The children, through their Guardian ad Litem, bring this action pursuant to 42 U.S.C. § 1983.  Section 1983 of Title 42 of the United States Code provides, in relevant part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any

> citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Section 1983 is not an independent source of substantive rights; rather it is a mechanism for enforcing federal rights conferred elsewhere, see Albright v. Oliver, 510 U.S. 269, 271 (1994), and provides a remedy "for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law." Curley v. Klem, 298 F.3d 271, 277 (3rd Cir.2002).  Accordingly, an analysis of a plaintiff's federal civil-rights claim necessarily begins by identifying the specific constitutional right or rights allegedly infringed.  Graham v. Connor, 490 U.S. 386, 393-94 (1989).

In this case, the children assert that their Fourteenth Amendment right to substantive due process was violated when Mr. Martinez and Ms. Archuleta certified the Crespin home and placed the children in a foster setting that they knew or suspected to be dangerous. These Defendants' actions, allege the children, amounted to an abdication of their duty to act professionally and to exercise professional judgment, and also created a danger of harm to the children. [Doc. 1 at 8-9].  Mr. Martinez and Ms. Archuleta  have moved for summary judgment on the ground of qualified immunity.  [Doc. 92 at 23-31].

When a defendant asserts the defense of qualified immunity, the "heavy two-part burden" shifts to the plaintiff to show that the defendant is not entitled to immunity.  Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).  To overcome a qualified-immunity defense,

a plaintiff must establish (1) a violation of a constitutional or statutory right, and (2) that the right was clearly established at the time of the violation. It is not mandatory that the plaintiff establish the violation before showing that the right was clearly established. See Pearson v. Callahan, 129 S.Ct. 808, 818 (2009) (holding that the procedure whereby a plaintiff was required to demonstrate violation of a constitutional or statutory right *before* showing that the right was clearly established, as set forth in Saucier v. Katz, 533 U.S. 194 (2001), "should no longer be regarded as mandatory.").

The qualified-immunity inquiry, "it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Saucier, 533 U.S. 194, 201 (2001). Indeed, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [person in the defendant's position] that his conduct was unlawful in the situation he confronted." Id. at 202. This is not to say, however, that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful. Rather, it is to say that the unlawfulness must be apparent in light of pre-existing law. Hope v. Pelzer, 536 U.S. 730, 739 (2002).

For a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must be as the plaintiff maintains. Farmer v. Perrill, 288 F.3d 1254, 1259 (10th Cir. 2002). An official can still be on notice that his conduct violates established law even in novel factual circumstances; the "salient question" is whether the state of the law at the relevant time gave

14

him fair warning that the conduct at issue was unconstitutional.  See  Hope, 536 U.S. at 741.

By contrast, summary judgment based on qualified immunity is appropriate if the law did not

put the defendant on notice that his conduct was clearly unlawful.  Saucier, 533 U.S. at 202.

If, however, the plaintiff successfully establishes both a violation of a constitutional right and

that the right was clearly established at the time of the alleged conduct, the burden shifts to

the defendant, who must prove that there are no genuine issues of material fact and that the

defendant is entitled to judgment as a matter of law.  Olsen v. Layton Hills Mall, 312 F.3d

1304, 1312 (10th Cir. 2002).  "In the end, therefore, the defendant still bears the normal

summary judgment burden of showing that no material facts remain in dispute that would

defeat the qualified immunity defense."  Id.

### 3. The Fourteenth Amendment and Substantive Due Process

The Fourteenth Amendment to the United States Constitution provides, in pertinent

part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due

process of law. . . ."  U.S. CONST. art. XIV, § 1.  The right to substantive due process is the

right to be free from arbitrary and oppressive state action, see Seegmiller v. LaVerkin City,

528 F.3d 762, 767 (10th Cir. 2008), as well as state action that shocks the conscience, see

Chavez v. Martinez, 538 U.S. 760, 787 (2003) (Stevens, J., concurring in part and dissenting

in part).

Indeed, "[t]he ultimate standard for determining whether there has been a substantive

due process violation is whether the challenged government action shocks the conscience of

federal judges.  It is well settled that negligence is not sufficient to shock the conscience."

Camuglia v. The City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006). The bar is high, as "the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking. . . ." Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995); see also Robinson v. Robinson, 2008 WL 205300, at *2 (D. Colo., Jan. 22, 2008) (in action for deprivation of substantive due process resulting from alleged malicious prosecution, "plaintiff ha[d] not shown . . . the exceptional, outrageous, conscience-shocking affront to personal autonomy that is required to clear the extraordinarily high bar the Tenth Circuit has set for such claims.").

> The requirement that the plaintiff establish a sufficiently high level of outrageousness
>
>> advances three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety.

Camuglia, 448 F.3d at 1223 (internal citations omitted).

The Tenth Circuit has held that "[g]enerally, state actors are liable under the Due Process Clause only for their own actions and not the actions of private citizens." Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1141 (10th Cir. 2006). Exceptions to this general rule exist, however, and state actors may be held liable where (1) they create a danger that results in a harm to an individual, even if that harm is not ultimately inflicted by a state official; or (2) the state has a "special relationship" with the individual who is harmed by the third party. Id. The Court analyzes these two theories in reverse order.

16

**a. The Special Relationship Theory**

A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual. <u>Uhlrig</u>, 64 F.3d at 572. The reasoning is that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." <u>DeShaney v. Winnebago County Dept. of Soc. Servs.</u>, 489 U.S. 189, 199-200 (1989). Accordingly, a special relationship may exist between the state and a prisoner, <u>see</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 103-104 (1976), or between the state and one who has been involuntarily committed to a mental institution, <u>see</u> <u>Youngberg v. Romeo</u>, 457 U.S. 307, 324 (1982). In 1992, the Tenth Circuit extended this concept to children in foster care when it held that such children possess a substantive due process right to reasonable safety. <u>Yvonne L., By and Through Lewis v. New Mexico Dept. of Human Servs.</u>, 959 F.2d 883, 893 (10th Cir. 1992).

In <u>Yvonne L.</u>, children brought suit pursuant to 42 U.S.C. § 1983 against the New Mexico Department of Human Services and individual Department employees for injuries sustained at the hands of third parties while the children were residing in a privately operated crisis shelter group home. <u>Yvonne L.</u>, 959 F.2d at 885. The district court entered summary judgment for the individual defendants on the basis of qualified immunity, having concluded that "there was no clearly established constitutional right in August 1985 [the time of the assault here] protecting a child in the legal and physical custody of the state, who was placed in a privately operated crisis shelter group home, from bodily harm from third persons." <u>Id.</u>

Reversing on this point and remanding, the Tenth Circuit held that Supreme Court

precedent,[6] Tenth Circuit authority,[7] and cases from other circuits,[8] all of which were decided

before August 1985,

> clearly alerted persons in the positions of defendants that children in the custody of a state had a constitutional right to be reasonably safe from harm; and that if the persons responsible place children in a foster home or institution that they know or suspect to be dangerous to the children they incur liability if the harm occurs.

Id. at 893.

In an effort to provide guidance to the district court on remand, the Tenth Circuit also

determined the applicable standard as a failure to exercise professional judgment, explaining

that "'[f]ailure to exercise professional judgment' does not mean mere negligence . . .; while

it does not require actual knowledge the children will be harmed, it implies abdication of the

duty to act professionally in making the placements."  Yvonne L., 959 F.2d at 894.

---

[6] Youngberg v. Romeo, 457 U.S. 307 (1982).

[7] Milonas v. Williams, 691 F.2d 931, 942 (10th Cir.1982), cert. denied, 460 U.S. 1069 (1983) (juveniles involuntarily placed in a private school by state agencies or courts had due process liberty interests, including the right to reasonably safe conditions of confinement).

[8] K.H. ex rel. Murphy v. Morgan, 914 F.2d 846 (7th Cir.1990) (recognizing "a prima facie right not to be placed with a foster parent who the state's caseworkers and supervisors know or suspect is likely to abuse or neglect the foster child."); Taylor By and Through Walker v. Ledbetter, 818 F.2d 791, 797 (11th Cir. 1987) (en banc), cert. denied, 489 U.S. 1065 (1989) ("We hold that a child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a child confined in a mental health facility that the foster child may bring a section 1983 action for violation of fourteenth amendment rights."); Doe v. New York City Dep't of Social Servs., 649 F.2d 134 (2d Cir.1981), cert. denied, 464 U.S. 864 (1983) (holding that children in state custody has constitutional right not to be placed in foster care settings known to be unsafe).

Still, it is not the role of the courts to second-guess a "judgment exercised by a qualified professional."   Youngberg, 457 U.S. at 322.  To the contrary, the courts "must show deference to" such determinations.  Id.  Thus, a "decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  Id. at 323.

Turning now to the facts of this case, and the application of the special-relationship theory to those facts, the Court concludes that the children have not satisfied the heavy burden they bear as opponents of the invocation of qualified immunity.  See Medina, 252 F.3d at 1128.

The children argue that Mr. Martinez and Ms. Archuleta are not entitled to the protections of qualified immunity because they abdicated their professional responsibility when they licensed the Crespin home and placed the children there.  More specifically, the children argue that Mr. Martinez "fail[ed] to apply minimum department standards for licensure that required him to take all reasonable doubts about whether Mr. Gonzales and Ms. Crespin had resolved their volatile relationship in favor of the safety of children[,]" and that Ms. Archuleta similarly "failed to resolve reasonable doubts about the safety of the Crespin home in favor of the safety of the children." [Doc. 99 at 43-44].

The children first assert that Mr. Martinez and Ms. Archuleta "misstate[] the law [when they argue] that the [children] cannot demonstrate a constitutional violation [because]

the children went into respite care with Ms. Crespin . . . only after Mr. Martinez and Ms. Archuleta abdicated their professional responsibilities." [Doc. 99 at 45-46].  It is the position of Mr. Martinez and Ms. Archuleta that "the allegations surrounding Crespin's licensing as a foster parent do not appear to comport with liability under the special relationship theory.  The Mondragon children simply were not within CYFD's custody when Crespin received her license; and no special relationship existed at that time." [Doc. 92 at 29].

Although the children recognize that "[t]he special relationship exception . . . emerges when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual[,]" they also contrarily assert that "[n]o law . . . requires that the abdication of professional responsibility come only when the children are in state custody." [Doc. 99 at 46].  As the children note, the special relationship comes into play once the state "takes a person into its custody and holds him there [such that there then arises] a corresponding duty to assume some responsibility for his safety and general well-being."  DeShaney, 489 U.S. at 199-200.  In this case, Ms. Crespin's licensure was approved and she was licensed on October 3, 2003. [See Doc. 99; Exh. 13, "Foster Care Home Study" at 6].  The children were not taken into the custody of CYFD until October 10, 2003, when they were removed from their biological parents' home and taken into state custody on an emergency hold. [See Doc. 92 at 4].  The evidence of record indicates, therefore, that there was no special relationship between CYFD and the children on October 3, 2003, when Ms. Crespin's foster-care license was approved, and her license mailed to her.

Even if there were evidence of a special relationship between CYFD and the children at the time of licensing, there is no evidence that either Mr. Martinez or Ms. Archuleta failed to exercise professional judgment (let alone abdicated their professional responsibilities) in making the decision to grant Ms. Crespin a foster-care license.  While it is undisputed that a special relationship existed between CYFD and the children at the time of placement on October 18, 2003, there similarly is no evidence that either Mr. Martinez or Ms. Archuleta failed to exercise professional judgment or abdicated their professional responsibilities in placing the children with Ms. Crespin.[9]  See Yvonne L., 959 F.2d at 894.

The children claim that

> "evidence . . . abounds [that] Mr. Martinez and Ms. Archuleta abdicated their professional responsibility when they abandoned application of clear CYFD regulation to give Ms. Crespin the benefit of the doubt and grant her a license in the face of very particular knowledge of the dangers to children posed by Mr. Gonzales, Ms. Crespin and their volatile mix of guns, alcohol, rage, self-loathing, co-dependency and morbid fascination.

[Doc. 99 at 47].

The CYFD regulation to which the children refer is found at § 8.27.3.15(B)(2) of the New Mexico Administrative Code and provides, in pertinent part, that

---

[9]  There is a dispute as to whether Ms. Archuleta was involved in actually placing the children in the Crespin home.  According to her, she "was not involved in arranging the Crespin house as respite for the Mondragon children." [Doc. 92; Exh. O, Archuleta affidavit at 1].  Moreover, Mr. Martinez testified that he was unsure whether Ms. Archuleta approved the placement decision. [See id.; Exh. C, depo. of Patrick Martinez at 114-117].  However, the children argue that both "Mr. Martinez and Ms. Archuleta . . . placed them amidst known dangers." [Doc. 99 at 50].  Because this Court views the allegations in a light most favorable to the children as the non-moving parties, the Court will assume without deciding that Ms. Archuleta was responsible for making the decision to place the children with Ms. Crespin.  See Johnson ex rel. Cano v. Homes, 377 F.Supp.2d 1039, 1043 (D.N.M. 2004).

[c]riminal records checks of all applicants and all other adults in the home will be required and will include a national criminal records check (FBI Check) a state wide check through the New Mexico state police and local police check. Any police records discovered in the police records check shall be reviewed for information affecting an applicant's qualifications. *Persons who have constructively resolved previous problems may be licensed,* except that no person who has a record as described in 13.3 [now Subsection C of 8.27.3.13 NMAC] shall be licensed. *Any reasonable doubt that prior misconduct has been resolved shall be interpreted in favor of the safety of foster children, and the application denied.*

N.M. ADMIN. CODE 8.27.3.15(B)(2) (emphasis added).

Notably, § 8.27.3.15(B)(2) requires "[c]riminal records checks of all applicants and al other adults *in the home*. . . ." N.M. ADMIN. CODE 8.27.3.15(B)(2). While it is not entirely clear whether Ms. Crespin and Mr. Gonzales ever lived together,[10] it is undisputed that, if they did, he moved out in April 2003.[11] Thus, even if Mr. Gonzales had at some time been an "other adult[] in the home[,]" he was not in the home at the time of the October 3, 2003 license approval, or even on June 11, 2003, when Ms. Crespin applied to become a foster

_____

[10]  [Compare id.; Exh. 5, Crespin depo. at 22, 107-108 (explaining that Ms. Crespin and Mr. Gonzales lived together around the time of the April 2003 domestic-violence incident, but that he moved out right after that) and Doc. 92; Exh. F, Martinez aff. at 2 ("[Ms.] Crespin informed me that [Mr.] Gonzales did not live at her home and never had.").

[11]  [See Doc. 99; Exh. 5, Crespin depo. at 22:

Q:    How long did he live with you at [your home]?
A:    I don't remember.  I only remember that it was January that he moved in.  I don't—can't recall.
Q:    Could you recall a point when he stopped living there?
A:    April, from what I can remember.
Q:    What year?
A:    '03.

parent.  Yet once police-records checks revealed Ms. Crespin's involvement with Mr. Gonzales, Mr. Martinez and Ms. Archuleta staffed the matter and reviewed the police reports relating to the two incidents in some detail.  Because Ms. Archuleta continued to be concerned over the "uncertainty of [Mr. Gonzales' background [and] not knowing who he [was]" [see Doc. 99, Exh. 1, Archuleta depo. at 47], she "directed [Mr. Martinez] to inform Ms. Crespin that [Mr. Gonzales] must submit to police background checks as part of the Foster Parent licensing procedure. . . ."  [Id.; Exh. 13, "Chronological of Events" at 1].

The children do acknowledge that "[h]ad Mr. Martinez or Ms. Archuleta actually applied section 8.27.3.15 to their decision to license Ms. Crespin and her home . . . , this case might be as they wish it to be: a presumptively valid exercise of professional judgment." [Doc. 99 at 48].  The children go on to argue that Mr. Martinez and Ms. Archuleta "did not even begin to apply this standard.  The record of their actions is devoid of its mention." [Id.]. The record evidence, however, does not support this contention.

At her deposition, Ms. Archuleta was asked whether, "[i]n deciding to include the boyfriend in the certification process, Mr. Gonzales, did [she] apply or use any regulation or procedure at CYFD?" [Doc. 99; Exh. 1, Archuleta depo. at 78].  Ms. Archuleta responded "Yes," and although she was unable to cite "exact policy numbers or exact wording[,]" went on to explain that the policy she had applied was one directing inclusion in the certification process of "individuals who are—whether they're household members or nonhousehold members and if they're part of the individual's life. . . ." [Id.; Exh. 1, Archuleta depo. at 78-79].  Again, § 8.27.3.15 of the New Mexico Administrative Code, which is captioned

"Assessment Process of Foster Home Licence Application," provides, in pertinent part, that "[c]riminal records checks of all applicants and all other adults in the home will be required . . . ."  N.M. ADMIN. CODE 8.27.3.15(B)(2).

Additionally, as part of its assessment process, CYFD is required to conduct "an independent study" of prospective foster families.  See N.M. ADMIN. CODE 8.27.3.15(A). "Assessment" is defined in the Social Services chapter of the code as "the process of *collecting factual information* and conducting interviews with applicants and other persons as deemed appropriate by the department or child placement agency, and of *evaluating the information* to make a recommendation that a license be issued or denied."  N.M. ADMIN. CODE 8.27.3.7(C) (emphasis added).  Both Mr. Martinez and Ms. Archuleta testified and, more importantly, the evidence of record demonstrates, that this is what they did.

A "Running Narrative Document" created by Mr. Martinez and Ms. Archuleta shows that, over the course of the 4-month period between Ms. Crespin's application for a foster-care license and the approval of that request, Mr. Martinez had 15 weekly contacts with Ms. Crespin, including 3 separate home-study visits. [See Doc. 99; Exh. 11, "Running Narrative Document"].  The Running Narrative Document also reveals that Mr. Martinez and Ms. Archuleta met on at least three occasions to discuss the effect of Mr. Gonzales' presence on Ms. Crespin's application for licensure. [Id.; Exh. 11, "Running Narrative Document"].  The entry for August 20, 2003 indicates that Ms. Crespin had "terminated [her] relationship with [Mr. Gonzales], due to his non-compliance with her requests for him to cooperate[] with licensing program."  [Id.; Exh. 11, "Running Narrative Document" at 2].  On that same date,

Ms. Crespin "stated that [Mr. Gonzales] was now NO longer involved in her life in any way." [Id.; Exh. 11, "Running Narrative Document" at 3 (emphasis in original)].   On September 5, 2003, Ms. Crespin "confirmed that [Mr. Gonzales] was no longer in her life." [Id.; Exh. 11, "Running Narrative Document" at 3].

Ms. Archuleta testified that, in making the decision to license Ms. Crespin's home, she considered "everything compiled together" and further explained that "everything is taken together as a whole to make the recommendation." [Doc. 99; Exh. 1, Archuleta depo. at 38].  Thus, in addition to considering the effect of Mr. Gonzales in Ms. Crespin's life, Ms. Archuleta testified that she considered that Ms. Crespin had already "had a lot of experience of crises in her young life [including] early pregnancy, single motherhood, ovarian cancer leading to sterilization, and dealing with the near-loss of a significant romantic relationship following a suicide attempt."  [Doc. 99; Exh. 1, Archuleta depo. at 123-124].  On the basis of this information, as well as the fact that Ms. Crespin "[u]ltimately . . .  chose to sever the relationship [with Mr. Gonzales], recognizing that it might jeopardize not only her licensing, but also the ultimate safety of her own immediate family[,]" Ms. Archuleta agreed with Mr. Martinez' assessment that Ms. Crespin had "demonstrate[d] her ability to learn from new insights, [meaning] that she [was] a strong candidate for licensure approval." [Doc. 99; Exh. 13, "Foster Care Home Study" at 5].

In conducting interviews and home studies with Ms. Crespin; discussing what was learned in at least three supervisor meetings; looking at the decisions Ms. Crespin had already made in her life; and considering "everything . . . taken together as a whole to make

the [licensing] recommendation[,]" Mr. Martinez and Ms. Archuleta clearly performed the independent study of prospective foster homes that is mandated by § 8.27.3.15 ("Assessment Process of Foster Home License Application") of the Social Services chapter of the New Mexico Administrative Code.  On the basis of what they knew and had learned as a result of their independent study, Mr. Martinez and Ms. Archuleta believed that Ms. Crespin had "resolved previous problems" with Mr. Gonzales by severing her relationship with him and making the determination that he would no longer be a part of her life.  See N.M. ADMIN. CODE 8.27.3.15(B)(2) (explaining that applicants "who have constructively resolved pervious problems" revealed during criminal checks may be licensed, but noting that "[a]ny reasonable doubt that prior misconduct has been resolved shall be interpreted in favor of the safety of foster children, and the application denied.").  They also came to the conclusion that Ms. Crespin's decision represented a "healthy, life affirming choice[] by a young mother showing a high degree of personal maturity." [Doc. 99; Exh. 13, Foster Care Home Study at 5].

The children's displeasure at having been placed at Ms. Crespin's on October 18, 2003 is both understandable and justified.  Still, there simply is no evidence that this placement amounted to "'such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person[s] responsible actually did not base the decision on such a judgment.'" Johnson, 455 F.3d at 1144 (quoting Youngberg, 457 U.S. at 323).  To the contrary, the evidence of record reveals that, because of what she believed to be Ms. Crespin's relationship with Mr. Gonzales, Ms. Archuleta directed Mr. Martinez to

conduct a background check on Mr. Gonzales, in compliance with § 8.27.3.15(B)(2) of the New Mexico Administrative Code, even though Mr. Gonzales arguably was not an "other adult[] in the home."  See N.M. ADMIN. CODE § 8.27.3.15(B)(2).  Then, on the basis of information gathered and assessed during their independent study and in compliance with § 8.27.3.15(A), Mr. Martinez and  Ms. Archuleta came to the conclusion that Ms. Crespin was "a strong candidate for licensure approval." [See Doc. 99; Exh. 13, Foster Care Home Study" at 5].

Where, as here, a professional decision has been made, and that decision does not represent "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment[,]" Youngberg, 457 U.S. at 322, the decision is presumptively valid and it is not the place of this Court to second-guess it.  Because the Court determines that neither Mr. Martinez nor Ms. Archuleta failed to exercise professional judgment in making the decisions to license the Crespin home and place the children there, neither Mr. Martinez nor Ms. Archuleta can be said to have violated the children's Fourteenth Amendment substantive due process rights.  Accordingly, for the reasons discussed, Mr. Martinez and Ms. Archuleta are entitled to the protections of qualified immunity to the extent the children seek to impose liability on the basis of the special-relationship theory.

**b. The Danger-Creation Theory**

Noting that the children have alleged that the individual defendants created a danger of harm in both certifying the Crespin home and subsequently placing the children there,[12] Mr. Martinez and Ms. Archuleta also have moved for summary judgment with respect to the children's danger-creation theory. [See Doc. 92 at 25-28].

As an initial matter, the Court notes the children's assertion that

> [Mr. Martinez and Ms. Archuleta] have briefed both special relationship and danger creation liability. Mot. for Summ. J. at 23-32. However, the existence of the special relationship through foster care, which is undisputed by [Mr. Martinez and Ms. Archuleta], absolves the [children] of the obligation to meet the more stringent standards of a danger creation case. *See generally DeAnzona v. City and County of Denver*, 222 F.3d 1229, 1234-35 (10th Cir. 2000) (where no special relationship can be established, plaintiff must proceed under danger creation

---

[12]  The allegations of the Complaint state, in pertinent part, that

> 43.  The individually named defendants each created a danger of harm to the Mondragon children, in violation of the children's due process rights under the constitutions of New Mexico and the United States.

> 44.  The danger of harm included, but is not limited to, certifying the Crespin home for foster care placement with knowledge that the home had recently been the site of violence and abuse; and with knowledge that Francine Crespin and her boyfriend had a history of problems and violence, including incidents of grave bodily injury with firearms.

> 45.  The danger of harm further included CYFD's placement of all five children in the Crespin home, despite the fact that it was only certified for one child.

[Doc. 1 at 7-8].

exception).

[Doc. 99 at 44, n.4].  For this reason, it appears, the children's Response does not address the danger-creation theory, relying instead entirely on the special-relationship theory to advance their case.[13]

A claim may be waived if it is not raised in a party's summary-judgment response. See Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 880 n.8 (10th Cir. 1997) (where non-movant failed to raise Clayton Act § 3 claims in either its summary-judgment response or on appeal, claims were waived).  "Waiver" is defined as "the 'intentional relinquishment or abandonment of a known right.'"  United States v. Olano, 507 U.S. 725, 733 (1993) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).  In asserting that "the existence of the special relationship . . . absolves the [children] of the obligation to meet the more stringent standards of a danger creation case[,]" this Court believes that the children have intentionally abandoned and, therefore, waived their originally asserted danger-creation theory.  [See Doc. 99 at 44 n.4].  However, for the purpose of creating a complete

---

[13] [See, e.g., Doc. 99 at 44 ("[T]he complaint and the disputed material facts show that both Mr. Martinez and Ms. Archuleta violated the . . . children's Fourteenth Amendment substantive due process rights by abdicating their professional responsibility."); at 45 ("Because the disputed material facts demonstrate an abdication of professional responsibility to the . . . children while they [were] in foster care, the Defendants enjoy no qualified immunity."); at 46 ("The [children] must demonstrate an 'affirmative link' between the failure to exercise professional judgment and the injuries to [them]. . . ."); at 47 (noting that "evidence in fact abounds" of Mr. Martinez' and Ms. Archuleta's having "abdicated their professional responsibility or departed from accepted profession (sic) judgment, practice or standard in [a] manner that shocks the conscience."); and at 50 ("Mr. Martinez and Ms. Archuleta, charged with protecting [the children] by law, . . . abdicated professional responsibility. . . .")].

record, the Court will address the danger-creation issue.[14]

As stated above, state actors may be held liable for the violent acts of third parties if those actors created the danger resulting in  harm.  See Johnson, 455 F.3d at 1141.

> To make out a proper danger creation claim, a plaintiff must demonstrate that (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

Currier v. Doran, 242 F.3d 905, 918 (10th Cir. 2001).  Additionally, the danger-creation theory "necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger."  Ruiz v. McDonnell, 299 F.3d 1173, 1183 (10th Cir. 2002) (internal

---

[14]  The Court also notes that, rather than responding to the 37 paragraphs that Mr. Martinez and Ms. Archuleta have set forth in their summary-judgment motion under the heading "Statement of Undisputed Facts," the children have set forth their own 137-paragraph "Statement of Disputed Material Facts" without "stat[ing] the number of the movant[s]' fact that is disputed."  See D.N.M.LR-Civ. 56.1(b). Moreover, the paragraphs in the children's "Statement of Disputed Material Facts" do not appear to correspond to those in Mr. Martinez' and Ms. Archuleta's "Statement of Material Facts." [Compare Doc. 92 at 4-11 and Doc. 99 at 1-21].

Notwithstanding, however, that the Response may not have been presented in "exactly the format contemplated by the local rule," and in the interest of fairness and again for the purpose of creating a complete record, the Court has considered the allegations set forth in the children's "Statement of Disputed Material Facts" alongside those set forth in Mr. Martinez' and Ms. Archuleta's "Statement of Disputed Facts."  See Walker v. City of Orem, 451 F.3d 1139, 1156 (10th Cir. 2006) ("specifically reject[ing]" defendant's argument that his undisputed statement of facts constituted the only evidence to be considered for purposes of qualified-immunity inquiry where plaintiff in summary-judgment response did not (as required by local rule) dispute most of defendant's facts but, instead, prepared a statement of additional facts that she contended were undisputed).

citation omitted).  Such affirmative conduct "should typically involve conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration[, and] should be directed at a discrete plaintiff rather than at the public at large."  Id.

In Ruiz, where an infant died as a result of head injuries sustained during violent shaking he experienced at a day-care center, the Tenth Circuit held that "the mere licensure of [the center did not] constitut[e] the requisite affirmative conduct necessary to state a viable § 1983 claim."  Ruiz, 299 F.3d at 1183.  The circuit explained:

> Specifically, the improper licensure did not impose an immediate threat of harm. Rather, it presented a threat of an indefinite range and duration. Moreover, the licensure affected the public at large; it was not aimed at [the infant] or [plaintiff/infant's mother] directly. Unlike the direct placement of a child into an abusive home, the mere licensure of [the center] was not an act directed at [the infant] which, in and of itself, placed [the infant] in danger. For those reasons, we conclude that [plaintiff] has failed to allege any affirmative conduct on the part of the State Defendants that created or increased the danger to [the infant].

Id.

The Ruiz reasoning is applicable here: the mere licensing of Ms. Crespin's home, which was not aimed at the children directly, did not pose an immediate threat of harm. Accordingly, Mr. Martinez and Ms. Archuleta are entitled to the protections of qualified immunity for the claim that they created a danger to the children by *licensing* Ms. Crespin's home.

Mr. Martinez and Ms. Archuleta also are entitled to the protections of qualified immunity for the claim that they created a danger to the children by *placing* the children in

Ms. Crespin's home, as the children have not demonstrated that (1) the conduct of Mr. Martinez and Ms. Archuleta put the children at substantial risk of serious, immediate, and proximate harm; (2) the risk was obvious or known; (3) Mr. Martinez and Ms. Archuleta acted recklessly in conscious disregard of that risk; and (4) such conduct, when viewed in total, is conscience shocking.  See Currier, 242 F.3d at 918.

As to the immediacy of the harm, it is undisputed that "[a]s of October 16, 2003, when respite care was arranged, there had been no disturbance in [Ms.] Crespin's home since the April [2003] incident." [Doc. 92 at 10, "Statement of Undisputed Facts" ¶ 32].  Ms. Crespin had severed her relationship with Mr. Gonzales in August 2003, and confirmed in September 2003 that he "was no longer in her life." [Doc. 99; Exh. 11 at 3].  Ms. Crespin testified that when Mr. Gonzales refused to participate in the licensing process, they stopped "[c]ommunicati[ng] with each other." [Doc. 92; Exh. L, Crespin depo. at 42].  She also testified that at that time, Mr. Gonzales was not in her house. [Id.; Exh. L, Crespin depo. at 42].  Moreover, it is undisputed that, even if Ms. Crespin and Mr. Gonzales had lived together in the past, they no longer lived together after the April 2003 domestic-violence incident, which occurred nearly two months before Ms. Crespin completed her foster-parent application and six months before she was licensed and the children placed in her home for respite care.

Further, the conduct of Mr. Martinez and Ms. Archuleta is simply not conscience-shocking.  As explained more fully above, Mr. Martinez and Ms. Archuleta made the professional decision to place the children with Ms. Crespin based upon the totality of the

information that they had collected and evaluated during their assessment of her.  This information was gleaned during numerous weekly and home-study contacts with and interviews of Ms. Crespin, as well as determinations that Mr. Martinez and Ms. Archuleta made during their own supervisor meetings concerning the decision to license Ms. Crespin's home.  Having evaluated Ms. Crespin over the course of four months, Mr. Martinez and Ms. Archuleta ultimately reached the conclusion that Ms. Crespin had demonstrated a pattern of "life[-]affirming choices . . .  showing a high degree of personal maturity[,]" which, in turn, made her "a strong candidate for licensure approval." [Doc. 99; Exh. 13, "Foster Care Home Study" at 5].  Once again, to amount to "conscience-shocking" behavior, conduct must be egregious and outrageous.  See County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998).

That is just not the situation here.  Accordingly, the Court concludes that Mr. Martinez and Ms. Archuleta are entitled to the protections of qualified immunity with respect to the children's claim that these defendants created or increased a danger when they placed the children with Ms. Crespin on October 18, 2003.  Summary judgment will be entered in favor of Mr. Martinez and Ms. Archuleta as to Count IV of the children's Complaint.

### 4. Claims Arising Under the New Mexico Tort Claims Act

In addition to the claims they bring pursuant to 42 U.S.C. § 1983, the children assert that (1) CYFD was negligent in "fail[ing] to operate and maintain the Crespin foster home in a manner consistent with policy and procedure; (2) Ms. Crespin breached "a duty to exercise ordinary care, in light of all circumstances to protect the Mondragon children from

harm and injury[,]" and (3) both CYFD and Ms. Crespin breached the "Annual Agreement Between Licensed Foster Parents and Children, Youth, and Families Department," of which the children were intended third-party beneficiaries. [Doc. 1 at 6-7; see also Doc. 99 at 38].

CYFD has moved for summary judgment on the ground that it is immune from tort liability pursuant to the applicable sections of the New Mexico Tort Claims Act ("the Act"), whereas the children contend that immunity has been waived under the "building waiver" exception set forth in § 41-4-6 of the Act[15] and, presumably, § 37-1-23.[16]

Section 1367 of Title 28 of the United States Code provides, in pertinent part, that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy  . . . ." 28 U.S.C. § 1367(a).  Pursuant to subsection (c), however, the Court may decline to exercise its supplemental jurisdiction if, among other things, it has dismissed all claims over which it had original jurisdiction.  28 U.S.C. § 1367(c)(3).  In other words, once "the bases for

---

[15]  That section states, in pertinent part, that

> [t]he immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings.

N.M.S.A. 1978, § 41-4-6(A).

[16]  That section states, in pertinent part, that "[g]overnmental entities are granted immunity from actions based on contract, except actions based on a valid written contract." N.M.S.A. 1978 § 37-1-23(A).

federal subject matter jurisdiction have been extinguished[,] the district court may decline to exercise continuing 'pendent or supplemental jurisdiction over [the] plaintiff's state claims." Lancaster v. Indep. Sch. Dist. No. 5, 149 F.3d 1228, 1236 (10th Cir. 1998) (dismissing without prejudice plaintiff's claims for, *inter alia*, breach of contract after having entered summary for defendant on plaintiff's First and Fourteenth Amendment claims); see also Taylor v. Meacham, 82 F.3d 1556, 1564 n.1 (10th Cir. 1996) ("Once a federal court dismisses claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over related state law claims.").

In the instant action, the entry of summary judgment in favor of Mr. Martinez and Ms. Archuleta on Count IV extinguishes the basis for federal subject matter jurisdiction. See Lancaster, 149 F.3d at 1236. Accordingly, the Court declines to exercise its supplemental jurisdiction over the children's state-law claims. See 28 U.S.C. § 1367(c)(3). In so declining, the Court has considered whether the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction. See Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995). The Court is not convinced that these factors weigh in favor of retaining jurisdiction.

First, the agreement that is at heart of the children's breach-of-contract claim (Count III) is an agreement executed by a state agency and one of its foster parents and, therefore, is subject to evaluation under state law. Count III therefore is best suited to adjudication in a state court, as is Count II ("Negligence by Francine Crespin"), which the children maintain arises from CYFD's contractual duty to "accept liability for actions for which Ms. Crespin

would be liable under the [Act]." [Doc. 99 at 42].  Notions of comity and federalism demand

that a state court try such claims in the first instance, absent compelling reasons to the

contrary.  See Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir.

1990).

    Next, the "building waiver" exception that may or may not apply under the

circumstances presented here creates an exception to liability under the New Mexico Tort

Claim Act and is similarly subject to evaluation under state law.  To be sure, the children are

asking this Court to adopt the reasoning of the Tenth Circuit in Johnson, "which leads to the

inescapable conclusion that the Tort Claims Act's building waiver should be applied to the

circumstances alleged in [their] Complaint." [Doc. 99 at 28].

    The children are referring specifically to the Tenth Circuit's reliance on the New

Mexico Court of Appeals' holding in Young v. Van Duyne, that because of the extensive role

the state plays in regulating and operating foster homes, the "building waiver" exception

applied when the state placed an extremely violent young man in a foster home, where he

then killed his foster (later, adoptive) mother.  See Johnson, 455 F.3d at 1140; see also

Young v. Van Duyne, 92 P.3d 1269, 1275-76 (N.M. App. 2004).  Though there are clearly

similarities between  Young and the instant matter, (e.g., violent acts committed in the foster

home), Young involved the actual placement of the violent individual, while  the instant case

involves the placement of foster children in a home where CYFD should allegedly have

foreseen that violence would ensue at the hands of a third party.  The children here, therefore,

are asking this Court to extend Young to the facts of this case.  It is not, however, the place

36

of this Court to expand the law of New Mexico beyond the bounds already set by the state

courts.  See Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1280 (10th Cir. 2000) (*quoting*

Taylor v. Phelan, 9 F.3d 882, 887 (10th Cir. 1993) ("As a federal court, we are generally

reticent to expand state law without clear guidance from its highest court. . . .").  For this

reason, Count I also is best suited to adjudication in a state court.

Finally, the Court's decision not to exercise supplemental jurisdiction is not

necessarily fatal to the children's state-law claims, as 28 U.S.C. § 1367(d) may provide for

the tolling of any limitations period regarding these claims.  For these reasons, the children's

claims for negligence and breach of contract will be dismissed without prejudice.  See

Lancaster, 149 F.3d at 1236 (where district court had entered summary judgment for

defendant on plaintiff's federal claims, affirming district court's decision to dismiss without

prejudice plaintiff's state-law claims).

## III. CONCLUSION

By entering summary judgment in favor of Patrick Martinez and Christine Archuleta,

and in declining to exercise its supplemental jurisdiction over the state-law claims asserted

against CYFD, this Court in no way intends to understate the seriousness of this matter or

to minimize or trivialize the ordeal that Paul Ruiz, Joseph Mascarenas, Destiny Mondragon,

Moranda Mondragon, and Jeffrey Mondragon, Jr. underwent on October 18, 2003.

Nevertheless, the applicable law as applied to the facts of this case dictates that Mr. Martinez

and Ms. Archuleta receive the protections of qualified immunity, and that the state-law

claims against CYFD be heard and decided in state court.  Accordingly, the motion for

summary judgment will be granted as to Count IV, and Counts I, II, and III will be dismissed without prejudice.

**IT IS, THEREFORE, ORDERED** that Defendants' *Motion for Summary Judgment* [Doc. 92] is **GRANTED** as to Count IV;

**IT IS FURTHER ORDERED** that Count IV is **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** that Count I is **DISMISSED WITHOUT PREJUDICE**;

**IT IS FURTHER ORDERED** that Count II is **DISMISSED WITHOUT PREJUDICE**;

**IT IS FURTHER ORDERED** that Count III is **DISMISSED WITHOUT PREJUDICE**;

**IT IS FURTHER ORDERED** that the **PRETRIAL CONFERENCE** set for TUESDAY, August 4, 2009, at 9:00 a.m., the **CALL OF THE CALENDAR** set for THURSDAY, September 10, 2009, at 9:00 a.m., and the **JURY SELECTION/TRIAL** set for MONDAY, September 14, 2009, at 9:00 a.m. are hereby **VACATED**.

**SO ORDERED** this 31st day of March, 2009, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge